## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| BUSINESS ARCHITECTURE GUILD<br><br>v.<br><br>DANIEL LAMBERT and<br>8781877 CANADA INC. D/B/A<br>BUSINESS ARCHITECTURE INFO. | AAA Case No. 01-23-0003-2525 |

## <u>RESPONDENTS' POST-HEARING BRIEF</u>

Respondent/Counter-Claimants Daniel Lambert and 8781877 Canada, Inc. hereby

provide their post-hearing brief.

### CLAIMANT'S DEMAND/CLAIMS

Claimant's Demand alleges two "buckets" of similarly situated claims.

### I. Claimant's Breach of Contract Claims/Copyright Claims

The Claimant's breach of contract claims fail for several reasons.

### A. Parties Agree on the Relevant Agreements

There is no dispute between the parties that Lambert and Mr. Ulrich both personally

signed the Contributor Agreement. *See* J06. There is also no dispute that the License Agreement

is applicable and binds the parties. *See* J05. Mr. Lambert does not dispute that the Terms of Use

are also applicable to this dispute. *See* C14.

### B. Applicable Contract Law, Construction Against Drafter

The Parties generally agree that the elements of breach of contract are "'(1) the contract,

(2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the

resulting damages to plaintiff.'" *Tribeca Cos., LLC v. First Am. Title Ins. Co.*, 239 Cal. App. 4th

1088, 1109, 192 Cal. Rptr. 3d 354, 371 (2015) (*citing Bushell v. JPMorgan Chase Bank, N.A.*,

Exhibit B to Menhart Affidavit

220 Cal.App.4th 915, 921) (2013). "The test for causation in a breach of contract … action is whether the breach was a substantial factor in causing the damages." *Id.* (citations omitted).

Moreover, "any ambiguities in a contract like Twitter's terms of service are interpreted against the drafter, Twitter." *Berenson v. Twitter, Inc.*, 2022 U.S. Dist. LEXIS 78255, at *6 (N.D. Cal. Apr. 29, 2022) (*citing Sandquist v. Lebo Auto., Inc.*, 376 P.3d 506 (2016)). In this case, there is no dispute that Claimant, with "input from [their] general counsel" exclusively drafted all the agreements at issue. *See e.g.* Trans. 49:4-7.

**C. Agreements Recognize "Fair Use," "Copyright," and "Copyright Law"**

The applicable agreements expressly recognize, among other things, "'fair use' provisions of the copyright law of the United States of America," (Ex. J06 at 1) and "applicable copyright and trade mark [sic] law" (Ex. C014 at 1). The Claimant admits, numerous times, that "Each of the Agreements Are Valid Contracts." *See e.g.* Claimant Post-Trial Brief at i, 5, 6 (claiming that all three contracts are "valid and enforceable).

**D. Some of Respondent's Frameworks Bear *Minor* Similarities to The Guild's Models but Respondents Marketed Only Their Original Works**

The testimony is clear that Respondent's position is that it is "for the arbitrator to decide" if the *minimal* similarities between the works of the two parties are legally actionable. Claimant also makes arguments about "access" and similar, but Respondents do not seriously consider those issues as disputed.[1] There is also little dispute that Respondents marketed their own works to third parties.

---

[1] Pages 7-11 of Claimant's Brief addresses many of these issues, but Respondent is of the opinion that this portion of Claimant's Brief is largely summation of existing evidence to which the Arbitrator has access.

Exhibit B to Menhart Affidavit

**E. Respondent's Minimal Copying, even if Proven, is Clear "Fair Use" Under Copyright Laws that the Agreements Themselves Contemplate**

Claimant's suggestion that it is immune and exempt from "fair use" provisions of the Copyright Act is completely meritless. First, "the law is the law." Every other entity in the United States is subject to the Copyright Act, and Claimant's suggestions that it is immune from laws it does not like is at once inaccurate and unbecoming.

Second, Claimant argues that "there is no carve out permitting purported 'fair use'" (Claimant Brief at 14) in *some* of the agreements that Claimant *itself* drafted, even though there is a clear recognition of "fair use" and "copyright" in two of the three agreements. The Claimant's suggestion that the Copyright Act, 17 U.S.C. § 107, recognizing "fair use" is not "applicable copyright law" is difficult to take seriously.

If Claimant had wanted to contract away these provisions, it may have been possible, but Claimant affirmatively chose to make them subject to "fair use" and "applicable copyright . . . law." Indeed, Claimant's own cited case recognizes that "parties are free to bargain away their rights to make fair use of copyrighted material under the 'private law' of contractual agreements." *Fox Broad. Co. v. Dish Network LLC*, 160 F. Supp. 3d 1139, 1179 (C.D. Cal. 2015).[2] Claimant failed to do this, ambiguity is construed against the drafter, the Guild, and "fair use" and "copyright" are elements of the contracts that must be considered in this matter.

**F. Fair Use Analysis**

Given that Lambert has "fair use" defenses, as contemplated by the agreements, Lambert's copying in this matter, even if demonstrated by the Claimant, is *clear* fair use. In determining whether the use made of a work in any particular case is a fair use the factors to be

---

[2] Moreover, the relevant contractual provision in the *Fox Broad Co.* case did not have "fair use" and "copyright" contractual provisions, as the agreements in this case do.

Exhibit B to Menhart Affidavit

considered shall include: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. *Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150, 1155 (N.D. Cal. 2008) (*citing* 17 U.S.C. § 107).

### 1. Purpose and Character of Use

As to the first factor, "the central purpose of this investigation is to see . . . whether the new work merely 'supersede[s] the objects' of the original creation." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579, 114 S. Ct. 1164, 1171 (1994). "In answering this question, we have used the word 'transformative' to describe a copying use that adds something new and important." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 29, 141 S. Ct. 1183, 1203 (2021) (*citing Campbell*, 510 U.S. 579). This goal of copyright "to promote science and the arts, is generally furthered by the creation of transformative works." *Campbell*, 510 U.S. 579.

As explained in detail below, the Respondent's works were *clearly* transformative. Most of the substantive text of Respondents' works, contained in the entire spreadsheets, were original content. Even by way of Claimant's own arguments, the Respondent's frameworks "modified" the original works in very substantive ways. The only case cited by Claimant was a mere "rebroadcast" of a video clip, that did not have substantial new "intellectual labor and judgment." *L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 938-39 (9th Cir. 2002). However, even in Claimant's own cited case, the court concluded that the use of the video clip **did** constitute fair use. Respondent's use is plainly transformative, and this factor is in Respondent's favor.

Exhibit B to Menhart Affidavit

## 2. Nature of the Copyrighted Work

This second factor weighs *heavily* in Respondents' favor. The record demonstrates that the purported copying related to a myriad of unoriginal, short phrases in BAG's models. These are not creative works. In evaluating a similar work, one court has explained that "[s]ince the Times Index is a work more of diligence than of originality or inventiveness, defendants have greater license to use portions of the Times Index under the fair use doctrine than they would have if a creative work had been involved." *N.Y. Times Co. v. Roxbury Data Interface, Inc.*, 434 F. Supp. 217, 221 (D.N.J. 1977).

One of the most prominent cases in Copyright Law jurisprudence came to a similar conclusion: that "**copyright in a factual compilation is thin**. Notwithstanding a valid copyright, a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work . . ." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349, 111 S. Ct. 1282, 1289 (1991) (emphasis added). The primary objective of copyright is not to reward the labor of authors, but "to promote the Progress of Science and useful Arts." Art. I, § 8, cl. 8. *Id.* (*citing Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156, 95 S. Ct. 2040, 2044 (1975). "To this end, copyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work." *Id.* (*citing Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 556, 105 S. Ct. 2218, 2228 (1985)). Respondent's works in this case were the "progression of science" and plainly protected under law.

Another recent Supreme Court case explained that an "**organizational function**" enjoys limited copyright protection. *Google LLC v. Oracle Am., Inc.,* 593 U.S. 1, 11, 141 S. Ct. 1183, 1192, 209 L. Ed. 2d 311 (2021) (emphasis added) To understand such systems, "think of the

Exhibit B to Menhart Affidavit

Dewey Decimal System that categorizes books into an accessible system or a travel guide that arranges a city's attractions into different categories." *Id.* In this case, Claimant's primary witness, Mr. Ulrich, used almost identical language to describe the Guild's models:

> Q. Okay. And what, generally speaking, is the Guild's services reference model?
> A. It's a set of capabilities, what you do, value streams, how we deliver value, stakeholders, the information we use, the **organizational structure**, and also they are adding products to that.

*See* Trans. at 25:18-23 (emphasis added). Moreover, Respondents' works were new tools for business architects. Courts agree that new ideas and resources are welcome in a market economy. The Eleventh Circuit recently explained that "at a higher level, the purpose was to create a 'new product [that] offer[ed] programmers a highly creative and innovative tool for a smartphone environment.' This higher-order purpose was what made [the] product transformative." *Apple Inc. v. Corellium, Inc.*, No. 21-12835, 2023 U.S. App. LEXIS 11225, at *28 (11th Cir. May 8, 2023) (citing *Google LLC*, 141 S. Ct. at 1203 (2021). As demonstrated, this factor weighs heavily in Respondent's favor.

### 3. Respondent's Use Was Minimal and Non-Infringing Under Law

Third, Plaintiffs cannot show that Lambert's uses, even if proven, are "substantial" compared to the copyrighted work "*as a whole*." *See* 17 U.S.C. § 107. As demonstrated below, this factor, again, weighs **heavily** in Respondent's favor.

For works of limited creativity, like the "organizational structures" at issue in this case, the Ninth Circuit has explained that "***there can be no infringement unless the works are virtually identical***." *Experian Info. Sols., Inc. v. Nationwide Mktg. Servs.*, 893 F.3d 1176, 1186 (9th Cir. 2018) (*citing Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1446 (9th Cir. 1994)) (emphasis added). In this instant case, the works are not even close to "identical."

Exhibit B to Menhart Affidavit

Consider in detail what the Claimant *admits* is its *best* evidence in this matter, namely, the comparison between the parties' "transportation" works.[3] *See* Exhibits C12 (Guild Spreadsheet), C19 (Claimant Comparison Document of "Capability" Sub sheet), C20 (Claimant Comparison Document – "Description" Sub sheet), C077 (Respondent Spreadsheet).[4]

First, Claimant's "Comparison Demonstrative" marked as C19 is a document created by Claimant itself, which evaluates similarities between "Guild Transportation Model 4.0.1 - Capability Column" (Exhibit C12) and Lambert Transportation Model 2022-07-22 - Capability Column (Exhibit C77). Exhibit C19 primarily considers a sheet entitled "Capability Map" that has 1888 lines (C12), but Claimant itself admits that the most "copying" that may have occurred is a "Total Count [of] 666," (see C19 at 25) which is a mere 35% of that *particular* column (666/1888 = 35.27%), in that *particular* sheet, which is *not* the entire spreadsheet.

Next, Claimant's "Comparison Demonstrative," marked as C20, is a document created by Claimant itself, which evaluates similarities between "Guild Transportation Model 4.0.1 - Description Column" (Exhibit C12) and Lambert Transportation Model 2022-07-22 - Description Column (Exhibit C77). Exhibit C20 again considers the "Capability Map" sheet that has 1888 lines (C12), but Claimant itself admits that the most "copying" that may have occurred in the "Description" column is a "Total Count [of] 326," (see C20 at 23) which is a mere 17% of that particular column (326/1888 = 17.26%), in that particular sheet, which is clearly *not* the entire spreadsheet file or "work."

---

[3] Claimant itself admits that "most egregious example" and "the most similarities are in Lambert's infringing July 2022 Transportation Framework compared to the Guild's Transportation Model v4.0.1." *See* Claimant Brief at 7-8. The parties agree there are less similarities in other comparisons cited by Claimant. *See* Ex. C16-C22; C99-C108.

[4] In Respondent's view, the copyright matter largely turns on evaluation of these four documents, and Respondent encourages the Arbitrator to review this section and related exhibits in close detail.

Exhibit B to Menhart Affidavit

**The Ninth Circuit has explained that a "match rate" of as much as 80% is "insufficient" to establish a bodily appropriation" of another's work.** *Experian Info. Sols., Inc. v. Nationwide Mktg. Servs.*, 893 F.3d 1176, 1187 (9th Cir. 2018) ("Even assuming Natimark's pairings were exact copies of their counterparts in the Experian database, the match rate would only be 80% and insufficient to establish a bodily appropriation of Experian's work.") Other courts agree. For example, the Eighth Circuit found a ratio of 74% of the same items in both the copyrighted work and the infringing work was insufficient to establish infringement. *Schoolhouse, Inc. v. Anderson*, 275 F.3d 726, 729-30 (8th Cir. 2002). The Sixth Circuit held that a match rate of 61% of the same items found in both a copyrighted and an infringing work was also insufficient to establish infringement. *Ross, Brovins & Oehmke, P.C. v. Lexis Nexis Grp.*, 463 F.3d 478, 483 (6th Cir. 2006) (a 61% match rate between the two compilations could "hardly be considered the 'same' selection").

Even if Respondents' works were "exact copies" of Claimant's, and they are not, Ninth Circuit jurisprudence precludes a finding of liability. However, Respondent's works additionally differed in two material ways. First and foremost, it is undisputed that Respondents' works were organized and "selected" in substantially different ways. Simple review of Claimant's own demonstrative exhibits (C19, C20) demonstrates that the "Row Numbers" in the different works differed substantially. Consider both Exhibits C19 and C20, where most of the rows had numerical differences of hundreds of lines. Moreover, despite no legal obligation to do so, Respondents made some other substantive changes, such as choosing to use the word "Capability" instead of "Ability" in certain instances. *See* Exhibit C20.

8

Respondent's "capabilities" were also organized in different "levels" and tiers, compared to Claimant's. *Cf.* Exhibit C12 "Capability Map" to C77 "Capabilities." These organizational differences are the heart of materials that are designed to create "business architecture."

Finally, and perhaps most importantly, the applicable law requires the consideration of the "whole" work. 17 U.S.C. § 107. The "whole" works, in this case, are the entire respective spreadsheet files. *See* C12, C77. In making this determination, the proper analysis is comparing "'the portion used' to 'the copyrighted work as a whole' and not the infringing work." *McGucken v. Pub. Ocean Ltd.*, 42 F.4th 1149, 1162 (9th Cir. 2022). Claimant ignores this critical consideration because even a cursory glance at the two works at issue demonstrates that the different spreadsheets are entirely different in most respects.

Take "Claimant's Transportation Reference Model Version 4.0.1" which has thirty-eight (38) individual sheets, with two or three-word titles such as "Create Policy," "Deliver Event," and "Disseminate Information." *See* C12. Compare that to Respondent's Transportation offering, which has fifteen (15) sheets, with one-word sheet titles like "Product," "Strategy," and "Stakeholder." Claimant's own evidence shows that only one (1) of Respondent's sheet, out of 38 sheets in Claimant's work, is even remotely infringing. **This is a mere 2.6% of the total number of sheets**.

Claimant's citation to *McGucken* does not help its case. First, that case involved photographs, works that are granted a much higher degree of protection than "works of limited creativity" like "organizational function[s]" that are at issue in this case. Moreover, that case undertook a slightly different analysis, evaluating the number of photos in the *infringing* work. In that case, "twelve of the article's forty photos came from [the copyright holder]." *Id.* Using that

9

tactic in this case, Respondent estimates[5] that the number of unique spreadsheet cells in the

Respondent's work is likely more than 100,000 (approximate average of 800 lines per sheet, 10

columns and 15 sheets in Exhibit C077). If 992 of those cells were the exact same text, according

to Claimant's own calculations (326 in C20 and 66 in C19), the evaluation of the *whole*

infringing work would lead to a "similarity rate" of 0.00992%, ***or less than 1% of the whole***

***work***. Again, this is the comparison of the evidence that the Claimant itself admits has "the most

similarities." *See* Claimant Brief at 7.

    <u>4. Respondent's Minimal Use Did Not Harm Claimant</u>

    Generally, "[t]he more transformative the new work, the less will be the significance of

other factors, like commercialism, that may weigh against a finding of fair use." *Monge v. Maya*

*Magazines, Inc.*, 688 F.3d 1164, 1174 (9th Cir. 2012), *citing Campbell v. Acuff-Rose Music, Inc.*,

510 U.S. 579, (1994).

    Moreover, the Guild admits that it is "a nonprofit organization devoted to promoting best

practices and expanding the knowledge base of the business architecture profession." *See*

Amended Complaint at ¶ 2. The trial record demonstrated similarly. *See* Trans. 17:6-9. Indeed,

Mr. Ulrich admitted that he was broadly concerned about the "industry" as opposed to the

Claimant. *See* Trans. 210:1-2 ("the damages that we're concerned about, is what's happening to

the industry, as a not-for-profit member-based association").

    However, the Guild does not have some God-given right to be the only purveyor of

"Business Architecture" content. Stated differently, Mr. Ulrich simply did not like that there was

a competitor in the marketplace, and his stated concerns were speculative and unproven at trial.

*See* Trans at 210:16-20 ("The damages to the Guild directly are that over time if enough

---

[5] The Arbitrator may certainly evaluate the exhibits independently.

Exhibit B to Menhart Affidavit

organizations start taking derivative works and distributing those out to third parties on a regular basis, there's no reason to come back to the Guild").

Finally, there is no demonstration that Lambert's alleged use had ***any*** effect on the market for the BAG membership model, and the underlying works that are provided for free to members. *See* Trans. 209:8-16 (members "getting [the models in this case] for free as a membership value"). The BAG materials were provided for free to its members and any sales of the work were minimal. Furthermore, Mr. Ulrich admits that the Guild is growing in membership:

> Q. And has the number of members stayed the same since 2010?
> A. No. It went from zero -- we opened membership in 2012. And on a continuous evolutionary, what we call a slow growth path -- because there just aren't that many business architects out there. So we're -- currently today we're just -- closing in on 4,000.

*See* Trans at 22:3-10. Certainly, if Respondent's works were having any effect, whatsoever, on the Guild, the Claimant would have demonstrated slower sales, membership cancellations or similar. To the contrary, the Guild demonstrated ***no effect whatsoever*** on its sales or membership. Yet again, this factor favors fair use.

In sum, all four fair use factors favor Respondents. The contracts recognize "fair use" and "copyright" laws and Respondent has demonstrated that fair use applies in this matter.

## II. Claimant's Claims 2-5 (Trademark Infringement and Unfair Competition claims)

"Courts 'jointly analyze[]' trademark infringement and statutory and common law unfair competition claims." *Henderson v. Lindland*, 2013 U.S. Dist. LEXIS 39992, at *8 (C.D. Cal. March 21, 2013) (citation omitted*)*.

First, the only evidence referenced by Claimant were six exhibits, and some references to the record. *See* Claimant Post-Trial Brief at 17 (*citing* Exhs. C110 at 21, 43; C31 at 43, 54; C32 at 61, 72, 74-77; C86 at 93-96; C84 at 100, 102-104; C96 at 57, 100).

Exhibit B to Menhart Affidavit

- **Exhibit 110**: This 96-page document was created by Respondent Lambert. *See* Trans at 301:8-10. (Q . . .You drafted this entire document in Exhibit 110, right? A. Yes.).
    - On page 21, Lambert cited his references and where the image had been obtained, namely, Wikipedia. *See* Ex. 110 at 24. The slide was plainly entitled "Business Architecture Guild Domains," and accurately displayed an image from Wikipedia.
    - On page 41, Lambert referred to Bizbok once (using the registered trademark symbol) as one of several definitions of "strategy," also referring to Wikipedia and the Harvard Business Review.
- **Exhibit C31**: This 131-page document was created by Respondent for a client.
    - Again, on Page 43, Lambert cited his references and where the image had been obtained, namely, Wikipedia. *See* Ex. 110 at 24. The slide was plainly entitled "Business Architecture Guild Domains," and accurately displayed an image that Claimant had never sought to have removed from Wikipedia.
    - Again, on page 54, Lambert referred to Bizbok once (using the registered trademark symbol) as one of several definitions of "strategy," also referring to Wikipedia and the Harvard Business Review.
- **Exhibit C32**: Exhibit C32 is a 152-page document created by Respondent for a client.
    - Respondent sees no reference to any Claimant trademark on page 61.
    - Page 72 had a reference to BizBok, with a direct link to the Guild's own website: https://www.businessarchitectureguild.org. That slide also contained references to other third parties and resources, such as "BIAN Service Landscape" and "APQC Process Classification Framework" and "IRIS Business Architect."
    - Page 74-77 references the BizBok model, including a screenshot by which a reader could directly buy the Guild's model from the Guild itself. Moreover, Lambert had a *reference link that was directly to the Guild's own website*: https://www.businessarchitectureguild.org/store/ViewProduct.aspx?id=1174654. Other slides were similar, offering direct references to the Guild's website.
- **Exhibit C86**: This is a 191-page document created by Respondent for a client.
    - Page 93 had a reference to BizBok, with a direct link to the Guild's own website: https://www.businessarchitectureguild.org. That slide also contained references to other third parties and resources, such as "APQC Process Classification Framework" and "IRIS Business Architecture Manufacturing Framework."
    - Page 94-96 references the BizBok model, including a screenshot by which a reader could directly buy the Guild's model from the Guild itself. Moreover, Lambert had a *reference link that was directly to the Guild's own website*: https://www.businessarchitectureguild.org/store/ViewProduct.aspx?id=14689383. Other slides were similar, offering direct references to the Guild's website.
- **Exhibit C84**: This is a 156-page document, like the other frameworks.
    - Page 100: Like other exhibits, the slide had a reference to BizBok, with a direct link to the Guild's own website: https://www.businessarchitectureguild.org.
    - Page 102-104: Again, like C86, references the BizBok model, including a screenshot where a reader could directly buy the Guild's model from the Guild itself. Moreover, Lambert had a reference link directly to the Guild's website.
- **Exhibit C96**: This is a 187-page document, like the other frameworks.

Exhibit B to Menhart Affidavit

- o  On Page 57, Lambert cited his references and where the image had been obtained, namely, Wikipedia. *See* Ex. 110 at 24. The slide was plainly entitled "Business Architecture Guild Domains," and accurately displayed an image from Wikipedia.
- o  Again, on Page 100, Lambert referred to Bizbok once (using the registered trademark symbol) as one of several definitions of "strategy," also referring to Wikipedia and the Harvard Business Review.

**B. Claimant's Trademark Infringement Claims Ignore Relevant Trademark Law**

Claimant's trademark claims are, respectfully, misguided and contrary to clear trademark law. "The likelihood of confusion analysis also involves a preliminary question: whether the defendants 'are using the challenged mark in a way that identifies the source of their goods.'" *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 610 (6th Cir. 2009) (*citing Interactive Prods. Corp. v. a2z Mobile Office Sols., Inc.*, 326 F.3d 687, 695 (6th Cir. 2003). If they are not, then the mark is being used in a "'non-trademark' way" and trademark infringement laws, along with the eight-factor analysis, ***do not even apply***." *Id.* Lambert's testimony reflected that his use was informational and promotional:

> Q. Mr. Lambert, you used a number of the Guild's trademarks in this presentation. Is that right?
> A. Maybe. Or yes, I did, but with web pages to the Guild and references to the Guild so that my students could learn more about other options in business architecture.

*See* Trans. 316:17-23. Moreover, as shown above, the references were buried deep in the various exhibits, and Lambert noted that "Most probably one or two slides out of about 200 to refer the Guild to my students. And they were a web page referring to the Guild." *See* Trans 319:20-24. Similarly, Mr. Ulrich admitted that the Guild did not have any evidence of any confusion.

> Q. Sir, do you have any evidence of anyone coming to you and saying they were confused by Mr. Lambert's models?
> A. I don't recall that -- anybody coming to us and saying they were confused by them.

13

*Trans* at 216:3-7. Upon review of Claimant's evidence, there is no serious argument that Respondent's references to Wikipedia are simply not trademark infringement. The Wikipedia page to which Respondent referred is in evidence, and does in fact contain the diagram and the BizBok references. *See* Exhibit R3. Moreover, every instance of purported "trademark infringement" contained a reference to the Claimant's own website. ***It defies logic that an actor would be attempting to mislead consumers, while actively and accurately promoting the trademark owner's own commercial website***.

A good example of a similar matter is *Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350 (9th Cir. 1969), where the Ninth Circuit held that Volkswagen could not prevent an automobile repair shop from using its mark. "Church did not suggest to customers that he was part of the Volkswagen organization or that his repair shop was sponsored or authorized by VW; he merely used the words 'Volkswagen' and 'VW' to convey information about the types of cars he repaired. Therefore, his use of the Volkswagen trademark was not an infringing use." *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 307 (9th Cir. 1992) "In technical trademark jargon, the use of words for descriptive purposes is called a 'fair use' and the law usually permits it even if the words themselves also constitute a trademark." *Id.*

Similarly, "competitors may use a rival's trademark in advertising and other channels of communication if the use is not false or misleading. *Id.* (*citing Smith v. Chanel, Inc.*, 402 F.2d 562 (9th Cir. 1968) (maker of imitation perfume may use original's trademark in promoting product). The U.S. Supreme Court espoused this same principle approximately one hundred years ago: "When the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth." *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368, 68 L. Ed. 731, 44 S. Ct. 350 (1924).

Exhibit B to Menhart Affidavit

In language quite applicable to the current matter, "the trademark laws do not give [a Plaintiff] the right to channel their fans' enthusiasm (and dollars) only into items licensed or authorized by them." *New Kids on the Block*, 971 F.2d at 309. (*citing International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912 (9th Cir. 1990) (no infringement where unauthorized jewelry maker produced rings and pins bearing fraternal organization's trademark).

Moreover, the Lanham Act itself provides that fair use is a defense against trademark infringement. "Fair use" is defined as "the use, otherwise than as a mark . . . of a term [] which is descriptive of and used fairly and in good faith only to describe the goods or services of [the] party." 15 U.S.C. § 1115(b)(4). The fair use defense applies when a mark is used in its primary descriptive sense rather than its secondary trademark sense. *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 925 F. Supp. 2d 1067, 1075 (C.D. Cal. 2012) (*citing Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1150 (9th Cir. 2002).

"The fair use defense *only* comes into play once the party alleging infringement has shown by a preponderance of the evidence that confusion is likely." *KP Permanent Make-Up, Inc.*, 408 F.3d at 608-09 (9th Cir. 2005) (*citing KP Permanent Make-Up v. Lasting Impression I, Inc.*, 543 U.S. 111, 118, 121 (2004) (emphasis added). As to nominative fair use:

> A defendant makes [nominative] fair use of a trademark when the defendant:
> 1.    Uses the mark in connection with the plaintiff's [product] [service], which was not readily identifiable without use of that [trademark] [mark];
> 2.    Used only so much of the [trademark] [mark] as was reasonably necessary to identify the [product] [service] in question; and
> 3.    Did not do anything in connection with the trademark that would suggest sponsorship or endorsement of the defendant's product or service by the plaintiff. [A product is not readily identifiable without use of the trademark when there are no equally informative words describing the product.]

*See* Ninth Circuit Model Jury Instructions, 15.25 Defenses—Nominative Fair Use (15 U.S.C. § 1115(b)(4)). Claimant's arguments on this point are predictably short, because the

Exhibit B to Menhart Affidavit

principle of nominative fair use is lethal to Claimant's trademark claims. *See* Claimant Brief at

18. Respondent's references to ***Claimant's own website***, and Respondent's inclusion of the

registered trademark symbol on Claimant's trademarked terms was "informational," if not

outright advertising, the existence of the Guild and its own materials.

Finally, Respondents' position is that the Ninth Circuit's eight-factor test ("Sleekcraft"

factors) to determine likelihood of confusion is largely immaterial[6] in this case now that all

evidence is on the record. *See e.g. Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir.

2008). Like the *Volkswagenwerk Aktiengesellschaft* and *New Kids on the Block* matters, the

relevant trademark questions presented in this case are (a) the preliminary question: whether the

defendants 'are using the challenged mark in a way that identifies the source of their goods,'"

and (b) fair use. Respondent should prevail on both issues.

### III. Claimant's "Spoilation" Arguments

First and foremost, Respondent fully complied with his discovery obligations. As the

extensive record demonstrates, Respondent produced emails, frameworks and numerous other

materials that were obviously not advantageous to him. Respondents were honest participants in

the discovery process.

Second, Lambert testified that he produced the documents in his files and did not change

metadata. *See* Trans 450:24-451:2 ("Q. Did you produce the documents that were within your

files as they appeared in your files for purposes of this litigation? A. Yes."). Lambert further

testified that he did not intentionally change metadata:

> Q. Sure. So sir, did you ever intentionally change any metadata in any of the documents
> produced in this case?
> A. I have not. And all I did change is for [attorney] eyes only. And I was told not to do
> that because it would change the date of the document.

---

[6] This is not a case where a Respondent is using, for example, "McRonald's" to describe a hamburger restaurant, and the *Sleekcraft* factors would be more applicable.

Exhibit B to Menhart Affidavit

*See* Trans at 448:10-15. Third, the record reflects that the Claimant was more than capable of accessing the Respondents' frameworks at any time using its "secret agent" system. *See* Trans. at 185:5-9. The Claimant had access to all models in the marketplace, yet knew that the transportation model was of greatest concern and concentrated their efforts in that respect.

Finally, with all due respect to opposing counsel, and their witness, Mr. Jarboe, Claimant's demands for formats and "load" files were simply contrary to the Federal Rules. *See* Fed. R. Civ. P. 34(b)(e). ("A party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request.") Mr. Lambert produced documents completely consistent with the rules, and Mr. Jarboe admitted that it had metadata. Trans at 364:15-17. ("Q. You admitted in your original document here that the first production had metadata, correct? A. Correct. We extracted metadata from it.) Mr. Jarboe further admitted that Mr. Lambert's testimony would control whether he produced relevant documents. *See* Transcript 366:25-367:3 ("Q. Okay. And Mr. Lambert would be in the best position to testify as to what the documents contain, correct? A. Yes.") As demonstrated, Lambert's participation in the litigation process was in good faith and in compliance with the Federal Rules. His testimony reflects the same and a review of the record demonstrates that the production was extremely forthcoming. No finding of spoliation is appropriate.

\* \* \*

## RESPONDENT'S COUNTERCLAIMS

Respondent's counterclaims are meritorious and should be sustained.

### I. Respondents' Breach of Contract Claim

The elements of a cause of action for breach of contract are set out above. In this case, Claimant *intentionally* breached the contract that *Claimant itself drafted*. *See* Ex. J5 at 2.

Exhibit B to Menhart Affidavit

Claimant and its attorneys ignored the clear arbitration clause, and instead filed suit in the U.S. District Court for the Northern District of California. *See* Ex. J41. Respondents incurred costs and attorney's fees in responding to the lawsuit, and successfully secured the abeyance of the case while the instant arbitration is undertaken.

Next, as to Claimant's misguided statement that Respondent has "presented *no evidence whatsoever* in support" (emphasis in original), Respondent need only point to the clear arbitration clause in the License Agreement, contained in a joint exhibit, and drafted exclusively by Claimant:

> **14. Binding Arbitration**: *Any* controversy or claim *arising out of or relating to this contract*, or the breach thereof, *shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules*, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

*See* Ex. J5 (some emphasis in original, some emphasis added). Next, Claimant's witness, Mr. Ulrich, admitted that Claimant filed the case in a federal court. *See* Trans. at 157:12-25. Mr. Keyes additionally drafted a letter admitting the same, which including the full text of the improper Complaint. *See* J41. Claimant clearly breached this provision, and Respondents "shall be entitled to an award of attorney's fees and costs." *See* Ex. J5 at 2, ¶ 13.

Unfortunately, Claimant misleadingly tries to suggest that "a contract to arbitrate by no means precludes a party to the contract from initially resorting to the court." *Sargon Enterprises, Inc. v. Browne George Ross LLP*, 15 Cal. App. 5th 749, 768 (2017). Claimant's citation refers to the California Arbitration Act, that involves *state* claims in *state* court. However, the "California Arbitration Act governs arbitral procedures *brought in California courts*." *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 922, 190 Cal. Rptr. 3d 812, 353 P.3d 741 (2015) (emphasis added).

18

Exhibit B to Menhart Affidavit

The FAA [Federal Arbitration Act] generally "governs the enforceability of arbitration agreements in contracts involving interstate commerce." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013). "When an agreement falls within the purview of the FAA, there is a 'strong default presumption . . . that the FAA, not state law, supplies the rules for arbitration.'" *Johnson v. Gruma Corp.*, 614 F.3d 1062, 1066 (9th Cir. 2010) (*quoting Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1269 (9th Cir. 2002)). A "general choice of law clause in a contract does not suffice to overcome the presumption." *Johnson*, 614 F.3d at 1066.

Furthermore, there is a strong presumption that the FAA provides the procedural rules for arbitrations in cases brought in federal court. *See Frid v. First Rep. Bank*, No. 12-cv-00806-JST, 2014 U.S. Dist. LEXIS 47950, 2014 WL 1365933, at *2 (N.D. Cal. Apr. 7, 2014) (citing *Johnson*, 614 F.3d at 1066-67) (finding parties had not demonstrated intent for CAA procedural rules to supplant FAA procedural rules where suit was brought in federal court); *Kim v. BMW of N.A., LLC*, 408 F. Supp. 3d 1155, 1158-59 (C.D. Cal. 2019) (finding CAA does not apply to motion to compel arbitration in case brought in federal court).

Here, Claimant (a) exclusively drafted the agreement, (b) breached the contract by filing suit in *federal* court, not state court, (c) included two federal causes of action in the Complaint (15 U.S.C. § 1114 and 15 U.S.C. § 1125(a)), but now claims that it should be relieved of its clear, intentional breach of contract. Claimant's positions should be rejected.

**II. Respondents' Counterclaim Re Pursuant to 17 U.S.C. § 512(f) ("DMCA")**

An allegation that a copyright owner acted in bad faith by issuing a takedown notice without proper consideration of the fair use doctrine . . . is sufficient to state a misrepresentation claim pursuant to Section 512(f) of the DMCA. *Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150, 1154–55 (N.D. Cal. 2008). Moreover, the statute provides that "[a]ny person who

Exhibit B to Menhart Affidavit

knowingly materially misrepresents under this section ... that material or activity is infringing ...

shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged

infringer ... who is injured by such misrepresentation, as the result of the service provider relying

upon such misrepresentation in removing or disabling access to the material or activity claimed

to be infringing[.]" *See* 17 U.S.C. § 512(f).

The Claimant clearly knew of fair use principles as early as the 2015 agreement. *See* Ex.

J6. However, Plaintiff did not have ***any*** written evidence that it engaged ***any*** consideration of the

fair use defense before sending numerous takedown notices. It is "eyebrow raising" that

Claimant had no email, no text message, no written "fair use" analysis, or any other written

evidence that would support Claimant's positions. Even Claimant agrees that the only evidence

of record on this issue is Mr. Ulrich's testimony. *See* Claimant Brief at 19. Accordingly, the

Arbitrator must credit, or not credit, Mr. Ulrich's testimony, because it is the only evidence of

record on this issue.

### III. Respondent's Counterclaim for Intentional Interference with Contract

A claim for intentional interference with a contract may be alleged when there is

(1) a valid contract between a plaintiff and a third party; (2) defendant's knowledge of this

contract; (3) defendant's intentional acts designed to induce a breach or disruption of the

contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5)

resulting damage. *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118 (1990).

In this case, Mr. Ulrich admitted that there was a contract[7] between Respondents and EA

Principals, that Claimant knew of the contract, and that Claimant had authorized an intentional

act designed to disrupt Mr. Lambert's contact with EA Principals.

---

[7] Claimant's suggestion that the written email agreement was not "cemented" is meritless, because "reviewing a written contract, we look to the objective manifestation of the parties' intent as expressed by the language of the

20

Exhibit B to Menhart Affidavit

Q. Okay. And you were familiar that EA Principals was working with Mr. Lambert?
A. I did understand that, yes.
Q. And so here in the middle of the letter, Mr. Keyes states, "Mr. Lambert and his company have and continue to engage in massive amounts of improper conduct." Do you see that?
A. Yes.
Q. And that was authorized by your group?
A. Correct.

*See* Trans. 156:14-157:3. Mr. Ulrich confirmed the same in later testimony:

Q. And who -- who made the decision at your organization to contact EA Principals and demand that Mr. Lambert stop working with them?
A. I authorized counsel to send the letters that were sent.
Q. And you asked for EA Principals to stop working with Mr. Lambert, correct?
A. We did.

*See* Trans 215:7-14. Mr. Lambert's testimony later reflected a breach or disruption:

Q. "EA Principals has stopped marketing the goods and services of 8781877 Canada Inc. (dba Business Architecture Info) since March 27, 2023." Did I read that correctly, sir?
A. Yes.
Q. And that's what you drafted and told EA Principals to send it to my law firm?
A. Yes.
Q. Now, in fact, EA Principals continued -- actually, before we get there. EA Principals actually did send that to me, didn't they?
A. I don't know. Probably. Most probably.

*See* Trans 289:1-13. Lambert's testimony continued:

Q. Okay. So now, that first -- I want to go back to focusing on that first sentence where you told EA Principals to tell Dorsey & Whitney that EA Principals had stopped marketing the goods and services of Daniel Lambert as of March 22nd, 2023. That, in fact, was inaccurate, wasn't it, sir?
A. Extremely accurate. I know that you sent a second e-mail saying that there was still my name mentioned two or three places, but that was not marketing. It was articles that I wrote and stuff like that. And they even deleted that once you aggressed them with your letter.

*See* Trans. 290:11-24. Other testimony in the trial discussed Lambert's "business relationship with EA Principals" (Trans. at 418:11-12), and "agreement to work together"

---

agreement." *San Pasqual Band of Mission Indians v. State of Cal.*, 241 Cal. App. 4th 746, 757, 194 Cal. Rptr. 3d 231, 238 (2015) (*citing* Cal. Civ. Code § 1638).

Exhibit B to Menhart Affidavit

(Trans. 419:15). Lambert also testified about "three of four" "letters from Mr. Keyes" (Trans. at 420-421). The resulting disruptions were damaging to Mr. Lambert.

> Q. And did this harm your business, your proceeds, your receipts?
> A. It killed it, as Madam Fawn who said in one of her e-mails.

*See* Trans at 423:24-424:1. At the end of the day, Claimant and its counsel *wanted* to disrupt the contract, and did so, by sending multiple letters to third party EA Principals. Yet, there was *no reason* to do this. Even if Claimant's claims were supportable, and, as demonstrated above, they are not, Claimant could have simply filed the arbitration without engaging in the bad-faith letter writing campaign.

Claimant also claims "privilege" for the completely unnecessary letters, but the law is clear that privilege "may be lost by defendant if he abuses it by excessive publication or the inclusion of immaterial matters which have no bearing on the interest sought to be protected, or if the uttered statements are actuated by malice." *Deaile v. General Telephone Co. of California* (Cal. App. 2d Dist. 1974), 40 Cal. App. 3d 841, 115 Cal. Rptr. 582, 1974 Cal. App. LEXIS 909. The letters contain extreme language, and some of the letters contain language similar to that which **Claimant's own attorney**, **Mark Alcorn, previously referred to as "disparaging."** *See* Exhibit R1. (Alcorn writing that "fraud," "misrepresentation of facts" or "illegal" conduct qualifies as "disparaging.") Mr. Keyes's letters contained abusive and immaterial statements like:

- Threatening EA Principals with a subpoena if they did not voluntarily comply with Claimant's demands, despite having no subpoena power in any litigation or arbitration at the time of the letter. *See* J42 at 2.
- Claiming to EA Principals that Respondents engaged in "massive amounts of improper conduct." *See* J41 at 1.

The intentional, "independent wrongful act[s]" were approved by Claimant, and carried out by Claimant's attorneys. Respondents should prevail on this claim.

22

Exhibit B to Menhart Affidavit

## DAMAGES AND OTHER RELIEF

### A. Claimant's Claims for Damages and Injunctive Relief

Respondent denies that Claimant is entitled to any damages, because Claimant should not prevail on any of its claims. As a matter of course, the Respondents will still address this issue.

As an initial matter, "the selection of which measure of damages to apply is within the sound discretion of the trier of fact." *Carlson Indus. v. E. L. Murphy Trucking Co.*, 168 Cal. App. 3d 691, 699, 214 Cal. Rptr. 331, 335 (1985). Damages for breach of contract "should be in an amount sufficient to place the injured party in the same economic position it would have occupied had the contract been fully performed." *New Invs. Inc. v. Altanatural Corp.*, 780 F. App'x 426, 429 (9th Cir. 2019).

Claimant's proposed method of disgorgement, where Claimant would recover *all* of Respondent's receipts, has been described by courts as a "penalty" and "harsh" *S.F. CDC LLC v. Webcor Constr. L.P.*, 62 Cal. App. 5th 266 (2021). Moreover, disgorgement of profits is not an appropriate remedy for a breach of contract. *Topps Co. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 269 (S.D.N.Y. 2005) (*citing Burger King Corp. v. Mason*, 710 F.2d 1480, 1494 (11th Cir. 1983). Moreover, the Claimant cannot demonstrate any damages and a "breach of contract without damage[s] is not actionable." *Patent Scaffolding Co. v. William Simpson Constr. Co.*, 256 Cal. App. 2d 506, 64 Cal. Rptr. 187, 191 (Cal. Ct. App. 1967).

Even if there is some damage, Claimant did not retain a damages expert or offer any cognizable damages theory. It must simply rely on damages it made of record. The only plausible evidence of damages to the Guild in the record is a sum of $13,000:

> Q. Okay. But for purposes of calculating how much money someone has directly paid for the models in this case, the number is approximately $13,000. And I understand the exhibit is in the record.

Exhibit B to Menhart Affidavit

A. The way that for nonmembers that have come to the Guild to actually get the models, in a retail price versus joining and getting it for free as a membership value, that's what the number shows.
Q. The $13,000?
A. Yes.

*See* Trans at 209:12-18. Moreover, when it comes to Guild membership, the testimony shows no loss at all, thus there is no economic loss for a "membership" category. *See* Trans at 22:3-10. The $13,000 number reflects *all* the Guild's past sales and represents the top of the possible damages award.

An alternative calculation comes to a similar number. Using the Claimant's own preferred data, namely, Ex. C30 ("Factures" Tab, row 270; columns H, J-O). Claimant alleges Lambert sold thirty-two (32) infringing products and the "retail" pricing on the Guild's website for each model is $350 (Ex. C32 at 74). Even if the Guild had captured all those sales, which is unlikely, the damages would have amounted to $12,250 (Lambert's 32 total sales multiplied by the Guild's $350 retail price for its models). This $12,250 number "places the injured party in the same economic position it would have occupied had the contract been fully performed." *New Invs. Inc*, 780 F. App'x 426, 429 (9th Cir. 2019).

As to the training sessions, there is no evidence that the Guild offered any training, or that the Guild was harmed by the trainings. Thus, the Guild would have had no expectation of any remedies for these personal services offered by Lambert. Even if the frameworks were used in those trainings, again, the damages would be approximately $350 per training, which is the purported value of the Guild's materials. Claimant provided evidence of only three training courses (C78, C79 and C80), which would mean an additional $1,050 in possible damages, for a grand total of $13,300. Had the Claimant retained a damages expert, the damages calculations

Exhibit B to Menhart Affidavit

would be more precise, but the evidence demonstrates that the ceiling for damages in this matter

should be around $13,000, even if Respondents were found to be liable.

### B. Claimant's Request for Injunctive Relief

As to injunctive relief, Mr. Ulrich admitted that the Claimant's *primary* concern was

"injunctive relief to prevent the distribution of derivative" content. *See* Trans at 210:12-13.

Respondent denies that injunctive relief is warranted in this matter, for reasons explained in

detail above, but recognizes that injunctive relief is a possible remedy under applicable law.

### C. Respondent's Request for Damages and Attorney's Fees

Respondent is entitled to damages and attorney's fees for its meritorious counterclaims.

As to Respondent's breach of contract claim, and DMCA claim, Respondent claims that it should

be awarded its attorney's fees, subject to a forthcoming fee declaration. *See* Ex. J5, *see also* 17

U.S.C. § 512(f).

As to Respondent's Intentional Interference with Contract counterclaim, the interfering

letters began *around* March of 2023. *See* Exhibit J41 at 1. Lambert had derived $77,599.08 in

total revenue from "EA Principals Agile Business Architecture Courses" beginning in May of

2022 until March of 2023 (10 months). *See* Exhibit C30 ("Factures" Tab, row 270; columns AT-

BL). This resulted in a monthly average of $7,759.90. Since the March 2023 letters, Lambert's

revenue has substantially fallen as to ""EA Principals Agile Business Architecture Courses." *Id.*

Notably, *total* revenue from March of 2023 to June 2024 was a mere $6,281.50. Based on

Lambert's prior sales, Respondents had a reasonable business expectation of $124,153.6 if

Claimant had not interfered with his contract with EA Principals. ($7,759.90 (monthly

expectation) multiplied by 16 months (March 2023 to June 2024). It is fair to deduct the

$6,281.50, noted above, that Lambert did recently obtain from his scheduled training.

Exhibit B to Menhart Affidavit

Accordingly, Lambert is entitled to a total damages award of $117,872.10. In summary,

Respondent's position on damages is as follows:

| Party | Claim | Proper Award |
|---|---|---|
| Claimant | Breach of Contract | $0 |
| Claimant | Omnibus Trademark | $0 |
| Respondent | Breach of Contract | Attorney's Fees Pursuant to Contract |
| Respondent | Intentional Interference | $117,872.10 (per calculations above) |
| Respondent | DMCA | Attorney's Fees Pursuant to 17 U.S.C. § 512(f) |

## CONCLUSION

Respondent appreciates the Arbitrator's careful consideration of the record.

* * *

Respectfully submitted,

/s/ Eric Menhart
Eric Menhart, Esq.
Lexero Law
512 C St NE
Washington, DC 20002
Phone: 855-453-9376
Fax: 855-453-9376

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2024, the foregoing was served via email to:

keyes.mike@dorsey.com
hansen.connor@dorsey.com
dianakruze@gmail.com

/s/ Eric Menhart
Eric Menhart, Esq.

Exhibit B to Menhart Affidavit